Thank you. May I reserve four minutes for rebuttal? You may, sure. May it please the Court, Eric Hamilton for the Nebraska Attorney General and Tax Commissioner. Tobacco manufacturers choose to do business in an area that has an increased risk for civil liability. That is why Nebraska law obligates tobacco manufacturers to place money into escrow as an insurance policy against the possibility that the State of Nebraska might obtain a civil judgment against them. The district court erred in enjoining defendants' enforcement of these statutes. The district court's reasoning is inconsistent with a substantially similar decision in the Ninth Circuit, and this Court would create a circuit split if it affirmed. The Ninth Circuit relied on the U.S. Supreme Court's decision in Mescalero v. Jones. In that case held that a Indian exposes himself to generally applicable State laws by leaving the reservation's boundaries. Applying that principle to Washington State's escrow laws, the Ninth Circuit found that the State could enforce that law against a tobacco manufacturer based on an Indian reservation. Alito How would you, counsel, how would you describe the subject of the regulation in this matter? In other words, the issue you just raised is a tribal member, an Indian, going off the reservation. But in this case, I think the issues before us are the sales that occur on the reservation. Is that correct? I'm not sure I agree, Your Honor. The district court drew a line between the cigarettes that are sold on the Winnebago reservation and the cigarettes that are sold on the Omaha reservation. But the actual transaction that triggers the escrow statute is the transaction between the cigarette manufacturer, Rock River or, I'm sorry, it's the wholesaler, which is HCI, and the retailer that HCI is selling to. Is that really true? Aren't you trying to escrow funds that directly involve the sale of members to members on the reservation itself? And if that's the case, when that's happening, that seems to me, you can go back as far as Wooster v. Georgia and look at the line of, you know, I know Wooster's got kind of messed up after Castro v. Huerta, where they've kind of made a claim that somehow all of what the Wooster says about the state's authority to regulate is dicta, and we have Justice Kavanaugh's majority opinion sitting out there, which is limited on its own terms to the criminal cases. But it seems to me there was no indication that Wooster v. Georgia was overruled. And if you look at the two prongs of thought in Wooster v. Georgia, the second prong being that the states have no ability to legislate or regulate Indian to tribal or Indian to Indian conduct that takes place on an Indian reservation. And to the extent that the State is attempting to escrow for sales that occur on the reservation, doesn't it run afoul of, like, 180 years of precedent? No, Your Honor. And the reason is that the Rock River Company is bringing — in some cases, they're importing cigarettes from outside the reservation's boundaries. They're adding no value at all to those cigarettes. In cases like Colville — Well, focus on the transition. I'm sorry to interrupt. I'm going to have to step on his question. But focus on the transaction he's talking about, the actual purchase on the reservation by a Native American from a company that's part of the Native American tribe. You're not trying to get anything based on that, are you? Well, the — Not a bond, not a connection, not a reporting? That's correct. That's correct. And it's an escrow payment that the tobacco manufacturer is making in the end. The retailer and the end consumer are not, you know, what, paying the escrow. It falls on — the obligation falls on the manufacturer in the first instance and the wholesaler if the manufacturer is not paying. But we think Colville is an especially applicable case here. Go back to Judge Erickson's question, if I take you aside. But you say you are trying to base things on and regulate and — on sales that are from the tribe to its members on the reservation, right? Not directly from the tribe. It is from the — The company is owned by the tribe. It's an economic development company whose primary ownership is the tribe, right? That's right. That's right. Right. Its parent's parent is the Winnebago tribe. Are you saying it's an indirect regulation of that point of sale between tribal entity and Indian? That — that end consumer sale is indirectly at most regulated because — Well, it would be indirectly, wouldn't it? I mean, the price would go up. The price would go up, but the tobacco manufacturer is the entity that is bearing the burden of paying the escrow. Is there a case anywhere in the country that allows this sort of member-to-member escrow? Yes. The Ninth Circuit's case in King Mountain did not distinguish between sales on the reservation and outside the reservation's boundaries. But there the owner of the entity is just a member of the tribe, not the tribe, right? That's right. Isn't that a huge difference? We don't think so, Your Honor. We don't see anything in King Mountain, and Appalee's brief doesn't cite anything either that would provide a reason for this Court to draw — So the tribe's sovereignty is not impacted or otherwise affected in any manner because they are the owner of this corporation? That's right. That's right. And that makes sense because the tribe has decided to do business like any other company, and it would gain an unfair advantage. But it's transacting its business on the reservation, right, except for the purchase of raw materials or the supply, right? It's also selling off the reservation. Most Rock River cigarettes leave the reservation, and HCIED sells — But the transaction takes place on the reservation property before the cigarettes leave, right? Or are they selling — is HCI selling in State land? It does take place on the reservation, but if that really were the only inquiry, then it wouldn't make sense why the cigarettes that are sold on the Omaha reservation would be subject to the escrow requirement because that transaction between the wholesaler, HCIED, and the retailer is taking place on the reservation, as is the transaction between Rock River, the manufacturer, and HCIED. Isn't the difference that the Omaha reservation made an agreement with the on the Winnebago reservation? They entered into their own universal master settlement agreement with the tobacco companies? No, Your Honor. We don't think there's any significance to the universal tobacco settlement agreement for a few reasons. One, there isn't anything that the Winnebago tribe and Rock River can come to an agreement on that would extinguish the State of Nebraska's interest in bringing consumer protection claims based on tribal members who are Nebraskans. And second, there is no parallel between that agreement and the master settlement agreement. The universal tobacco settlement agreement is an agreement between Rock River and the parent company of its parent. But returning to the Jones test and King Mountain, this Court's decision in the State can still apply its statutes even for conduct that is occurring substantially on a reservation there. The tribal member was receiving a pension payment on the reservation, and the State statute applied because she had earned that pension payment. Well, Fond du Lac says that it forbids regulating or taxing income that's wholly from reservation sources earned exclusively. Listen to the adverbs. On the reservations and generated entirely on reservation lands. Now, we're talking about the sales that are looked to be that you're indirectly at best taxing being on the reservation. Doesn't even my Fond du Lac's test you lose on those? No, Your Honor, because the problem to return to Colville and King Mountain, which, again, has the same facts that we have here other than the identity of the tobacco manufacturer, Rock River is importing cigarettes and adding no value whatsoever. The concept of value added is something we see over and over in U.S. Supreme Court cases. And so this is an even easier case than King Mountain, because in King Mountain, the tobacco manufacturer was even growing tobacco on the reservation, sending it outside the reservation's boundaries for some processing before it came back for manufacturing. And then after the 100 percent of the materials are received from outside the reservation, Rock River is dependent on nonmember labor in doing the manufacturing process. About one-third of the individuals who have worked at Rock River since 2014 are not members. And then the company is selling these cigarettes outside the reservation, which is why the company complies with eight escrow state laws. So is this relevant to the Bracker balancing test? Or do you – the argument you're making now, is that a Bracker argument? No, Your Honor. That's an argument solely under Mescalero against Jones. And we have a second argument before the Court would get to Bracker, and that is the Alexander case that this Court decided. Have we ever relied on Alexander for this sort of question since that case? I don't – I don't know the answer to that, but Alexander cites for its standard Colville. And Colville says that the – the businesses on an Indian reservation smoke shops have to comply with generally applicable state laws, even though there is some burden on them. And the standard is whether the regulation is reasonable and reasonably related to the State's regulatory authority. And the Nebraska statutes meet that standard because they serve this purpose of ensuring that the State of Nebraska can collect on judgments that it may receive against tobacco manufacturing companies like Rock River. But even if this Court gets to Bracker balancing, the district court erred in its balancing in several ways. One, the – well, everyone agrees, I should say at the outset, that the State has a interest in the public health of its citizens. But the district court erred in calling this a punitive exaction to protect the participating manufacturers in the master settlement agreement. One, it is not a exaction. This is money that the tobacco manufacturer will get back after 25 years. And it also is not punitive. It serves the purpose of ensuring that there is not this disbalance in the market that causes consumers in this price-sensitive market to go purchase more cigarettes from tobacco manufacturers that are not backed by that insurance policy I mentioned. But even if this Court gets to Bracker balancing – I'm sorry, the Federal interest the district court also erred on because the Court acknowledged that this was a quite different case from cases like Bracker and Cabazon in New Mexico where you see the Federal government's hand in the tribal business. But it still looked at that dearth of Federal involvement and concluded that that Federal interest favored the tribal business. If there's no – Well, isn't it more correct that what they said, what the district court said, was that the dearth of Federal involvement meant that the interests of the tribe, which were sovereignty, public health, and economic development all favored rather than – and that under Bracker, those are part of the Federal interest because of the dependent domestic status of the Indian nations, right? And so what they're looking at is the tribal sovereignty issue, the tribal sovereign answers not to the state, is not dependent on the state. It preexists the state. It was in existence long before the state of Nebraska ever came to be. And that that tribal sovereignty is within – is subsumed within – you know, and it's all based on a doctrine of conquest, and I get that's a bizarre idea. But it's all based on that doctrine. And they're saying that it's a Federal interest at that point, and we have to The problem, though, is all of those are generalized interests. None of them have anything to do with tobacco. And if that were the case, then – Well, is that necessarily true? Once you have the universal settlement agreement that the tribe has entered into, once they've – and they have their own public safety and public health concerns, but they also have a very significant economic development concern in areas that are historically economic – historically underprivileged. Yes. So as for the UTSA, I'm not aware of any Federal involvement in that agreement. It's just an agreement between the Winnebago tribe. But it's an exercise of the Winnebago tribe's sovereignty, right? And isn't the sovereignty of the tribe necessarily tied to the Federal government? Because it doesn't exist but for the existence of this dependent domestic nation status that – you know, that goes back to the very first Indian law cases, the very first of the Marshall Trilogy cases. If that were so, though, then there would just always be a Federal interest favoring the tribal interest. Well, not necessarily because the State interest could still outweigh the tribal interest, right? Right. And so I'm more surprised that you're not arguing that whatever these things are, our State's interest is greater than the tribal interest. Well, we are arguing that as well. I was trying to take the different interests step by step. Right. And so turning – no, no. Step on your answer, I'm sure. No, no, no. Turning to the tribal interest, the district court emphasized many of the points Your Honor is indicating, the centrality of the business. But it simply isn't accurate with respect to the Rock River Company. It is not a major income generator for the Winnebago tribe. So the tribe, though, is entered into an MSA with the tobacco companies. Is that right? Why isn't that flip the switch or, you know, tilt the scale in the balancing under Bracker? Because it doesn't change Nebraska's interest in But doesn't it up the tribe's interest under Bracker? Well, I don't see how requiring the Rock River Company to pay escrow changes the UTSA. Well, would they be paying double escrow in this case if you win? The Rock River Company would, but that's distinct from the tribe. Well, you know, I guess we went through it. It's wholly owned by the tribe, right? It is because of the unique circumstances of the tribe ways. So they're just going to be forced essentially to keep – in order to keep their business competitive to undo their agreement or to release Rock River from their MSA, tribal MSA. That seems like a big, big result. The tribe has to breach a contract or negotiate a way out of a contract protecting its own citizens because the state is assuming regulatory authority in their place. Or am I misreading what's going on here? What would go on? In the end, we think that the tribal interest is this interest in exploiting its status of being on the reservation. And cases like Colville say that artificial advantages like that aren't going to be enough for a tribal interest to trump other interests. The same problem was there in Colville where the on-reservation businesses were arguing, look, we're going to have to pay double taxes now. That's going to really reduce the amount of revenue and sales that we're receiving. The Court found that that was not enough. If Your Honors don't have further questions, I'll reserve the rest of my time for rebuttal. You may. Thank you. Mr. Berry. Thank you, Your Honor. May it please the Court and Counsel, my name is Andy Berry. I represent HCI Distribution and Rock River Manufacturing. This case involves, as I think the questions of the Court indicate, the core of tribal immunity. I want to touch briefly on what it's not about. It's not about application of escrow requirements outside to sales outside a reservation. My clients aren't contesting the applicability of escrow requirements when the ultimate retail sale is made outside the reservation. It's not about regulation of non-members of a tribe. The regulations here fall directly on the tribal development entities that are wholly owned by the tribe and imbued with the tribe's sovereign immunity.  And under that standard, under the Constitution and the governing precedents of this Court, includes Bracker, it includes Cabazon, it includes Nome, just to name a few, a State's attempt to do that, to directly regulate a tribe on its own territory, requires exceptional interest to overcome. And we agree with Judge Girard that the interests that were, that have been cited by appellants are decidedly unexceptional. Okay. Go ahead. You go ahead. Is the subject of the regulation here really on, the regulation on tribal conduct on the reservation? I mean, the tobacco here is imported. I think the manufacturing is done on the reservation, right? Is that the only thing that's off-reservation purchases made for the tobacco and then shipped to the reservation and then manufactured? In your view, is that the only thing that goes on off the reservation? It's not my view that that's the only thing on the reservation. And I think you have to look at, there's been a What else is there on the reservation? Sure. There's historical, there's a historical progression here. So the record shows that in the early years, the tribe was essentially importing cigarettes, applying a tax stamp, maybe repackaging them, selling them. That's not what happens now. They're raw materials. They're imported onto the reservation. Then they're manufactured into cigarettes at a factory on the reservation. The tribe has invested a substantial amount of money in that factory. And then beyond that, there's manufacturing. There's distribution. There's retail sale. There's marketing. The marketing, the trademarks and the product design comes from tribally owned corporations. And the state wants to downplay those things. And I understand it's not the same thing as manufacturing. But in our economic system, those are all valid, economically valuable components. Sales to non-members on the reservation. Couldn't they do something about that? Some way set up an escrow or directory system or reporting system? Couldn't who do something about that? The state of Nebraska. I think they could. I think the state could. The state made a decision, and I think they made it in collaboration with the participating tobacco companies, to have the escrow requirement fall on manufacturers for whatever reason. We don't know. But that could change. It could fall on non-members. Well, can the manufacturer estimate how much of the sales are non-members on the reservation? I think that's the way that most cigarette taxing systems work for sales on reservations right now. So I think that would be easy. Is the injunction of the district court overbroad, then, in that there should be some way for Nebraska to enforce the directory and enforce all the rules as to sales to definitely non-members on the reservation? I don't think that the injunction is overbroad because, Your Honor, I may need to go back and look at the technical wording of the injunction. But I don't believe that this injunction, in this case, would prevent the state from changing its law to change who that requirement falls on. I thought this injunction said all cigarette sales on the reservation, whether to tribal members or the general public. I thought those are the words of the injunction. Right. But it's enjoining application of the escrow requirement, which falls on the manufacturer. So I understood your question to be asking about an escrow requirement that falls on... a system where the... one the furthest back, whatever you want to call it, has to estimate what happens at the retail sale. I don't... I still don't think that the injunction is overly broad in that case because the problem is that the escrow requirement applies directly to the tribe. I think your questions get at, would there be another way for the state to rewrite its law? And there may be. I also don't think that it's really the role of the district court to... I think the court would be engaging in legislation if it tried to craft a different type of injunction there. The real problem... Are you asserting that the statute has to change or that the regulatory scheme that's adopted by the state needs to change to limit the escrow to sales to non-members? What I'm saying is that I think if that were the case, you'd have a different... If the state did that, you'd have a different case in front of you. Well, you'd have a whole different set of issues. Right. You'd have an indirect regulation case under BRCA rather than a direct regulation case. It may or may not pass muster, but we don't even have that statute in front of us right now. Right now, we have a statute that directly imposes an escrow requirement on a tribally owned manufacturer. Could we direct the district court to blue pencil the injunction to allow the non-member sales? Does that require a different action, a different set of regulations under the statute? Presuming the statute allows Nebraska to do that. That's getting into some heady issues of the judicial role and equity. I think... But we make stuff up all the time. I understand, Your Honor. So I appreciate the invitation to contribute my thoughts. It seems to me like that is getting into asking the court essentially to draft a new statute for the state and that really isn't the proper role of the court. Here we have a very specific request for an injunction. I think it's amply supported by the facts and the law. And the state may or may not be able to respond to that. The legislature may or may not want to respond to that. I think it's the role of the Nebraska legislature to tackle that problem. Thank you. I want to pick up on some questions about the federal and tribal interests. Your Honor, I agree that the tribal interests are important here and in part because of the history of the relationship between the federal government and the tribes. And then in some sense, the tribal interests are the federal interests. I just want to point out also that there is a direct federal interest in tribal self-development. It goes back as far as the Reorganization Act in 1934. And other statutes and regulations that have been passed since then. And Judge Girard recognized that. And if you look at what's happening on the Winnebago Reservation, it really is remarkable what's happening. HCI and its subsidiaries are creating businesses. They're creating jobs. It's producing revenue that goes back to the tribe so that it can fund its operations, fund healthcare, community development. So help me out just understanding what's going on here. I mean, I understand that HCI has lost money in recent years. I assume that that's after all the dividends have been paid to tribal members and other economic development has been completed. Is that correct? No. How does it work? So the parent, HCI, is making money and it's contributing money back to the tribe. These particular subsidiaries that are before the Court today, HCI Distribution and Rock River, are not because of the escrow requirement. Absent the escrow requirement, they'd be making money and they'd be contributing profit to the tribe. They'd also be taxed. There's a tribal tax on cigarette sales that goes back into funding public functions on the reservation. So, you know, the appellants are saying, well, these entities don't contribute anything. But it's a catch-22. They're not contributing anything now because of the escrow requirement. And that's demonstrated in the record. We've gone nine minutes without mentioning King Mountain. Right. Is it true there would be a circuit split if we agreed with you? I don't believe so, Your Honor. Tell us why. Sure. I think that we start with King Mountain did not involve a tribally owned entity that's been specifically imbued with the tribe's sovereignty as the entities in this case did. It's a non-member. It was a member of the tribe. Tribe member. Right. Tribe member, but not a tribal entity. I think that's a huge difference. But also, the issue that was presented in King Mountain by that member, I mean, the reservation there was just a small part of the sales. The member wanted to be free of the state regulation even off the reservation. And so it just presented a blanket issue. And the Ninth Circuit really wasn't given the opportunity to focus on the issue of sales specifically on the reservation. So to the extent that King Mountain was decided the way it was, it was because there was an attempt on the part of the tribal member to exploit Indian status at the expense of the ability of the state to regulate. Right. And so that's the argument that they're making that your client is doing as well. So why is it really different? Right. So the difference there I think doesn't look, we don't look at the King Mountain case for that. But if you look at the cases where courts have said, you know, there's a problem with trying to market a different status and that's it. What they've said is that if there is actual economic development though that's taking place on the tribe that takes us out of that situation. And that's what's happening here. That's cabazon. We have a tribe that's engaged in, as a court found, sophisticated economic activity. And it's regulating itself under the Universal Settlement Agreement. And as Judge Gerard noted, there's no evidence that the tribal entities are in violation of the marketing restrictions in the Universal Settlement Agreement which are essentially identical to the MSA. The real holding of the Ninth Circuit is, it's stated two or three different ways, but that a tribal business must generate its products principally from reservation land and resources. I want to get close on the quotation. I am close. Yeah. Right. Okay. You're not generating the products from reservation land like they are or resources. So what do you say to the holding? I think if anything, that holding applies within the specific facts of the McKenna case. I think if you try to take that language and make it a broad holding that governs outside those facts, that it's just inconsistent with the cases of the U.S. Supreme Court and inconsistent with the federal interest in tribal self-development. I mean, it would essentially eviscerate that interest. No economic entity, public or private, in the modern world can raise all of its resources within the boundaries of something the size of the Winnebago Reservation or even the state of Nebraska. So I think that that holding, if applied literally outside the context of King Mountain, would be inconsistent with U.S. Supreme Court precedent. And I guess I would also say it's important, again, that that was a tribal member, not the tribe itself. I think that's a very significant fact. I want to see if there are other questions that you asked. That I'd like to respond to. Thank you. I guess what I would come to then is the state's asserted interest. We don't disagree that the state has an interest in public health. Winnebago Tribe has an interest in public health. The question is, what does the escrow requirement do to protect public health? And there are a couple of different ways that you can look at that. You can look at the history of the statute. The escrow requirement was put into place specifically as a result of the master settlement agreement with tobacco companies. There wasn't a hue and cry for public health that led to this. Well, you're a little wrong on the causation there because that's what led to the Attorney General's getting involved in forcing the settlement. Right, that's true. That's a little naive statement of it. With the tobacco companies, certainly there was, at least there was a lot of litigation around the country related to public health at the time. Forty-six states, as I recall. That's correct. Something in that range. That's right. Forty-six Attorney Generals of all different kinds. Go ahead. Right. But it was inserted in the law specifically at the behest of the tobacco companies because they were worried about a loss of market share. So we have that historical fact as to why the escrow requirement exists. That was bargain, counsel. Be fair. Okay. There was a bargaining to beat the band. Go ahead. Okay. I understand that it was bargain, but this was something that the tobacco companies were asking for. Yeah, of course. One of their chips. Go ahead. Right. If you look at the escrow requirement specifically in the Nebraska statute, it's tied to the additional costs that the tobacco companies were taking on as part of the master settlement agreement. That's what the amount of that escrow requirement is. And, in fact, a non-participating member can get their money back if it exceeds that. So that requirement isn't a free-floating public health requirement. What the state argued, I think somewhat nebulously below and even more nebulously on appeal, is, well, we have a public health interest because if we don't diligently, seek to diligently enforce the agreement, we could lose our money under the MSA. It's not really clearly argued in the briefs below what the trigger is other than a failure to diligently enforce and whether it even matters what happens in this case. In other words, does the state satisfy its burden to diligently enforce simply by litigating this lawsuit up to this point? If they lose, have they failed to meet that burden or have they, in fact, met that burden? There's nothing in the record on that. And what is the consequence? There's also nothing in the record on that. Under Federal Rule of Appellate Procedure 10, if the appellants want to make those arguments, they need to put evidence in the record. They didn't do it. You can search the appellate record in vain on that point. And if there's an argument beyond that as a matter of public record, the Attorney General of the State of Nebraska has the settlement agreement, the non-producing manufacturer settlement agreement posted on the website. And there it says if this court enters an order, if a court of competent jurisdiction enters an order that says the State can't constitutionally impose the ESCO requirements on a reservation, then the obligations go away. So the State has an interest in litigating this case. I don't think it has an interest in winning the case. I think it's actually the opposite. The State has an interest in a decision saying that it can't constitutionally impose its ESCO requirements on the reservation. But you agree their arguments aren't frivolous, right? What's that? You then logically agree that their arguments are not frivolous. Yeah, and we're not asserting that their arguments are frivolous. Proceed. Right. In closing, I'd just like to ask the Court to look at the economic, not the economic, the full reality of what the State is trying to accomplish here. It signed an agreement, the master settlement agreement with tobacco companies. The tribe wasn't a party to that agreement. The tobacco companies want the tribe to undertake the same economic burdens effectively. But the tribe is a sovereign. Its entities are sovereigns. And the Constitution just doesn't permit that to happen. And for that reason, we'd ask the Court to affirm the decision of the District Court. Thank you, counsel. Mr. Hamilton. Thank you, Your Honor. I'll start with King Mountain and the fact that this Court would create a circuit split if it affirmed the District Court. My friend on the other side identified a fact that we agree with, which is that the King Mountain business was not a subsidiary of a subsidiary of a tribe, but I never heard him identify any reason why that would change the analysis. He instead talked about the Cabazon case. That's a Bracker balancing case, which is distinct from the argument that we're making under Mescalero against Jones. And I also want to say a few words about the business. My friend argued that part of why Rock River and HCID have not been able to make more contributions back to the tribe is their compliance with escrow laws. But they are not complying with the escrow laws that we are talking about. They are complying with escrow laws in other States for other sales, but they have never complied with State of Nebraska escrow laws. And finally, a point about these products and where the value is, because as I said in my opening, so many Supreme Court cases talk about value add and the appropriateness of State regulation when there is value add off the reservation. Most of the value add in these products is from the materials that are imported from outside the reservation. Does the record reflect any expert testimony about the percents on value added? I'm not aware of expert testimony. Because economists can do that, but you say none of that's in the record. I'm not aware of expert testimony on that, but page 8 of the addendum, which is the district court's opinion, notes that the Rock River business spends $377 on materials and only $161 on the labor to make 20 cigarettes. And as I said in the opening, about a third of the labor that it uses are not members of the Winnebago tribe. We ask this Court would reverse the district court. Thank you. Okay. Thank both counsel for their arguments. Case number 23-2311 is submitted for decision by the Court. Ms. Vlasky.